IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LIU, et al.,

                    Plaintiffs,

      v.

EB5 GLOBAL SF, LLC, et al.,

                Defendants.

CIVIL ACTION
NO. 24-564

## OPINION

**Slomsky, J.**                                                    **July 15, 2025**

## TABLE OF CONTENTS

I.   **INTRODUCTION** ................................................................ 3

II.  **BACKGROUND** ................................................................ 5

  A.  **The Parties** ................................................................ 5

  B.  **Factual Background** ................................................................ 6

    1.  Sale and Purchase of the Hotel ................................................ 6

    2.  Plaintiffs' Investment in the EB-5 Fund .................................. 7

    3.  Soft Brand of the Hotel Through Marriott ............................. 9

    4.  Hotel Renovation Cost Overrun .......................................... 10

    5.  Fire at the Hotel ................................................................ 10

    6.  Hotel's Additional Loans and Default ................................. 11

    7.  Plaintiffs' Allegations ....................................................... 11

  C.  **Procedural Background** ..................................................... 11

III. **STANDARD OF REVIEW** .................................................. 13

**A.** **Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)** ............................................................................. 13

**B.** **Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)** ............................................................................. 14

**C.** **Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)** ...................................................................................... 15

**IV.** **ANALYSIS** ................................................................................................... 16

**A.** **Documents Incorporated into Amended Complaint** .................................. 16

**B.** **Motions to Dismiss Will Be Granted** .......................................................... 17

    1.    Court Lacks Subject Matter Jurisdiction ..................................................... 17

        a.    Defendant's Subject Matter Jurisdiction Arguments Are a Facial Attack on the Amended Complaint ........................................................... 18

        b.    Class Action Fairness Act Does Not Confer Subject Matter Jurisdiction ................ 19

        c.    Court Lacks Diversity of Citizenship Jurisdiction .................................... 22

    2.    Plaintiffs' Claims Are Time Barred by the Statutes of Limitations and Repose ........ 27

        a.    Counts I Through IV Are Time Barred by the Statute of Limitations ..................... 27

        b.    Count V Is Time Barred by the Statute of Repose ..................................... 31

**C.** **Motion to Strike Will Be Denied as Moot** .................................................. 33

**V.** **CONCLUSION** ............................................................................................. 33

## I.    INTRODUCTION

This case arises from Plaintiffs Nan Liu, Hao Liu, and Guangxiang Xu's (collectively, "Plaintiffs") dissatisfaction with their investment in the EB-5 SF Investment LP (the "EB-5 Fund"), which was used to purchase a hotel named the Renoir Hotel (the "Hotel").  The Hotel was owned by MiMa Real Estate Partners I, LLC ("MiMa").  In 2012, MiMa sold the Hotel to SF Hotel Investors, LLC ("SF Hotel Investors"), a company owned primarily by the EB-5 Fund and co-managed by B5 Global SF, LLC ("EB5 Global"), the general partner of the EB-5 Fund, and MiMa. EB5 Global funneled Plaintiffs' investments in the EB-5 Fund to SF Hotel Investors to purchase the Hotel.  Through this sale, Plaintiffs became investors in the Hotel.  SF Hotel Investors purchased the Hotel to renovate it and operate it as a modern hotel.

Prior to Plaintiffs' investments, the EB-5 Fund provided Plaintiffs and other potential investors a Confidential Private Offering Memorandum ("CPOM"), which detailed SF Hotel Investors' plan for the Hotel, including management and branding as well as the estimated renovation costs and deadlines.  At that time, as reflected in the CPOM, SF Hotel Investors intended to enter into a franchise agreement with Marriott to "soft brand" the Hotel under Marriott's Autograph Collection.[1]  Despite this initial plan, SF Hotel Investors ultimately elected not to enter into the agreement with Marriott, reporting to its investors in a March 2015 letter that the terms offered by Marriott were unfavorable.  In addition, the Hotel's renovation took three years longer than the CPOM predicted and the total renovation cost exceeded the estimated budget

---

[1]  A "soft branded" hotel is an independently owned hotel that is affiliated with a major hotel chain pursuant to a franchise agreement, allowing the hotel to leverage the chain's marketing, distribution, and loyalty programs while maintaining its unique identity and operation style. See Hotel Soft Brand, XOTELS REVENUE MGMT., https://www.xotels.com/en/glossary/soft-brand (last visited July 7, 2025).

by approximately $40 million.  To pay for this cost overrun, SF Hotel Investors took out additional loans and is now in default on these loans, placing Plaintiffs' investments at risk.

As a result, on May 8, 2024, Plaintiffs filed a Class Action Complaint against Defendants EB5 Global, SF Hotel Investors, MiMa, Renoir HM LLC ("Renoir"), Proper Hospitality LLC ("Proper"), Kor Realty Group LLC ("Kor"), Brad Korzen, Kelly Wearstler, Alex Samek, and Brian DeLowe (collectively, "Defendants").[2]  (Doc. No. 1.)  As explained further below, MiMa, Renoir, and Proper are affiliates of Kor (collectively with Kor, the "Kor Defendants"), the company that now manages the Hotel, while Brad Korzen, Alex Samek, and Brian DeLowe are principals of Kor.  Kelly Wearstler is Brad Korzen's wife and also an affiliate of Kor.

On December 10, 2024, Plaintiffs filed an Amended Class Action Complaint against Defendants, asserting the following claims:  (1) breach of contract against EB5 Global (Count I); (2) breach of fiduciary duty against EB5 Global (Count II); (3) breach of contract against EB5 Global and the Kor Defendants (Count III); (4) breach of fiduciary duty against EB5 Global and the Kor Defendants (Count IV); and (5) violations of Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act against all Defendants (Count V).[3]  (See Doc. No. 41.)  Counts I and V are direct claims brought by Plaintiffs on behalf of a class consisting of the EB-5 Fund investors, while Counts II, III, and IV are derivative claims brought on behalf of the EB-5 Fund and SF Hotel Investors.  (Id. at ¶ 22(a).)

Before the Court are Defendants' Motions to Dismiss the Amended Complaint, as well as SF Hotel Investors, Kor Defendants, Brad Korzen, Kelly Wearstler, Alex Samek, and Brian De

---

[2]  Plaintiffs also name Does 1-500 as Defendants, specifying that these presently unidentified defendants are "responsible in some manner for the wrongs alleged in th[e] [Amended] Complaint."  (See Doc. No. 41.)

[3]  The Amended Complaint is the operative Complaint in this case.  (See Doc. No. 41.)

Lowe's (collectively, the "Additional Moving Defendants") Motion to Strike requesting that the Court strike Exhibit 1 to the Amended Complaint. (See Doc. Nos. 45, 47, 49.) For reasons that follow, the Motions to Dismiss the Amended Complaint (Doc. Nos. 45, 49) will be granted and the Motion to Strike (Doc. No. 47) will be denied as moot.

## II.    BACKGROUND

### A.    The Parties

Plaintiffs Nan Liu, Hao Liu, and Guangxiang Xu are citizens of China who each purchased a limited partnership interest in Derivative Plaintiff EB-5 SF Investment LP (the "EB-5 Fund"). (Doc. No. 41 at ¶¶ 2-4, 22(a).) The EB-5 Fund is a 99.9% equity holder and creditor of Derivative Plaintiff/Defendant SF Hotel Investors LLC ("SF Hotel Investors"). (Id.) EB5 Global Global SF, LLC ("EB5 Global") is the general partner of the EB-5 Fund and one of two managers of SF Hotel Investors. (Id. at ¶¶ 22(a)-(b).) The other manager of SF Hotel Investors is MiMa Real Estate Partners I, LLC ("MiMa"). (Id. at ¶ 22(b).)

As mentioned, SF Hotel Investors purchased in 2012 the Renoir Hotel ("the Hotel") from MiMa using the proceeds that its majority owner, the EB-5 Fund, obtained from Plaintiffs when they purchased limited partnership interests in the fund. (See id. at ¶ 30; Doc. No. 35.) EB5 Global and MiMa, as co-managers of SF Hotel Investors, oversaw the acquisition and renovation of the Hotel. (Doc. No. 41 at ¶ 26; Doc. No. 72.) The day-to-day operations of the Hotel were originally managed by Defendant Renoir HM LLC ("Renoir") but are now managed by Defendant Proper Hospitality LLC ("Proper"), a brand owned by Defendant Kor Realty Group LLC ("Kor"). (See Doc. No. 35 at 19; Doc. No. 41-1 at 34.)

MiMa, Renoir, and Proper are affiliates of Kor and alleged to be the alter egos of each other (collectively with Kor, the "Kor Defendants"). (Doc. No. 41 at ¶ 42.) The Kor Defendants are

5

under the common control of Defendant Brad Korzen, a principal of Kor. (Id.) Defendants Alex Samek and Brian DeLowe are also alleged to be principals of Kor, while Defendant Kelly Wearstler is Brad Korzen's wife. (Id. at ¶¶ 12, 13, 14-15.)

In sum, the parties and their respective roles in this case are as follows:

- Plaintiffs Nan Liu, Hao Liu, and Guangxiang Xu are limited partners of the EB-5 Fund

- EB5 Global is the general partner of the EB-5 Fund

- The EB-5 Fund is the primary owner of SF Hotel Investors, making Plaintiffs indirect investors in SF Hotel Investors

- SF Hotel Investors is a limited liability company co-managed by EB5 Global and MiMa; it is made up of three members: EB5 Global, MiMa, and the EB-5 Fund

- SF Hotel Investors purchased the Hotel from MiMa in 2012

- The Hotel was originally managed by Renoir but is now managed by Proper, a limited liability company owned by Kor

- MiMa, Renoir, and Proper are affiliates of Kor (collectively with Kor, the "Kor Defendants") and are alleged to be alter egos of each other

- Kor and its affiliates are controlled by Brad Korzen

- Brad Korzen, Alex Samek, and Brian DeLowe are principals of Kor

- Kelly Wearstler is Brad Korzen's wife

**B.    Factual Background**

**1.    Sale and Purchase of the Hotel**

On February 16, 2012, MiMa purchased the Renoir Hotel (the "Hotel") located in San Francisco, California. (See id. at ¶ 30; Doc. No. 35 at 18.) Later in 2012, MiMa entered into an

agreement to sell the Hotel to SF Hotel Investors. (Doc. No. 41 at ¶ 30; Doc. No. 35 at 18.) SF Hotel Investors, which was formed pursuant to a Limited Liability Company ("LLC") Agreement executed in November 2012, purchased the Hotel with the intention of continuing to operate it as a hotel after a renovation. (Doc. No. 41 at ¶ 26; Doc. No. 72.)

Under the LLC Agreement, SF Hotel Investors was made up of three members: MiMa, EB5 Global, and the EB-5 Fund. (Doc. No. 72 at 3.) In addition, MiMa and EB5 Global were the co-managers of SF Hotel Investors. (Id. at 7.) MiMa was largely in charge of managing the day-to-day operations, while EB5 Global was in charge of raising financing for SF Hotel Investors, including sourcing investors. (Doc. No. 72 at 11, 14.)

As consideration for acting as co-managers, the LLC Agreement specified that MiMa and EB5 Global were to each receive from SF Hotel Investors "10.5% of the project development costs, which include the costs and expenses in connection with the acquisition (i.e., sales commission), design and development and construction of the Hotel[.]" (Doc. No. 41 at ¶ 38.) In addition, once 115% of SF Hotel Investors' capital contributions and loans had been paid, the EB-5 Fund's interest in the Hotel would be reduced to 0%, leaving EB5 Global and MiMa as the sole owners of the Hotel. (Doc. No. 72 at 21-22.) In other words, the LLC Agreement "put into place provisions that would leave [EB5 Global and MiMa] 100% owners of [SF Hotel Investors] and the Hotel with the EB-5 Fund retaining no interest in either." (Doc. No. 41 at ¶ 39.)

### 2. Plaintiffs' Investment in the EB-5 Fund

As discussed, to finance SF Hotel Investors' purchase of the Hotel, EB5 Global, through its role as general partner of the EB-5 Fund, offered potential investors the opportunity to purchase one of 84 available limited partnership interests in the EB-5 Fund. (See generally Doc. No. 35.) Each limited partnership interest cost $500,000. (See id.; Doc. No. 41 at ¶ 22(a).)

Potential EB-5 Fund investors were provided promotional materials and a Confidential Private Offering Memorandum ("CPOM"). (See Doc. No. 41 at ¶ 21(b); Doc. No. 35.) Included in the promotional materials was a letter from the mayor of San Francisco, welcoming investment in the San Francisco neighborhood where the Hotel was located and indicating approval of the plans for the Hotel. (Doc. No. 41 at ¶ 44; Doc. No. 41-1 at 24.) The CPOM provided potential investors further information, including the investors' estimated return on investment, the terms of SF Hotel Investors' LLC Agreement, the estimated Hotel renovation costs, and the Hotel's intent to soft brand through Marriott. (See Doc. No. 35.)

As described by the CPOM, in return for their investments, the EB-5 Fund investors would receive aggregate distributions from the net cash flow of the Hotel equal to 115% of their initial capital contributions and loans to the EB-5 Fund. (See Doc. No. 35 at 55.) However, the CPOM also disclosed to investors the high risk associated with investing in the EB-5 Fund, and explicitly stated that there was no assurance investors would receive any return on their investments. (Id. at 58.)

In addition to these potential cash distributions, the CPOM also detailed how investment in the EB-5 Fund would qualify investors for EB-5 immigration visas. (Id. at 60.) As explained in the CPOM, "U.S. Congress created the employment-based fifth preference ("EB-5") immigrant visa category in 1990 for immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy." (Id.) Because such an investment opportunity would be attractive to foreign nationals seeking residency in the United States, EB5 Global allegedly hired immigration agencies in China to promote the opportunity to invest in the EB-5 Fund, agreeing to pay the agencies a "$50,000 one-time commission (followed by additional annual payments) for introducing every new EB-5 investor to the EB-5 Fund." (Doc. No. 41 at ¶ 44.)

Based on the promotional materials and CPOM, Plaintiffs Nan Liu, Hao Liu, and Guangxiang Xu each purchased a limited partnership interest in the EB-5 Fund. (See id. at ¶ 22(a).) To do so, each Plaintiff signed a limited partnership agreement and subscription agreement, as well as completed an investor eligibility questionnaire. (See generally Doc. Nos. 35, 35-1, 25-2.) Plaintiff Hao Liu executed these documents on December 7, 2012, while Plaintiff Nan Liu executed them on December 11, 2012, and Plaintiff Guangxiang Xu executed them on December 31, 2012. (See id.)

### 3.    Soft Brand of the Hotel Through Marriott

At the time Plaintiffs invested in the EB-5 Fund, SF Hotel Investors intended to enter into a franchise agreement with Marriott to soft brand the Hotel through Marriott's Autograph Collection. (Doc. No. 35 at 19.) As described by the CPOM, such an affiliation with Marriott would allow the Hotel to participate in Marriott's reservation system and loyalty program. (Doc. No. 35 at 19.) The actual day-to-day operations of the Hotel, however, were to be managed by Renoir rather than by Marriott. (Id.) This intent to soft brand the Hotel through Marriott is memorialized through a letter of intent dated November 19, 2012, which was included in the promotional materials and CPOM sent to the potential EB-5 Fund investors. (See Doc. No. 41-1 at 37-41.)

Despite the tentative agreement between SF Hotel Investors and Marriott for the Hotel to join Marriott's Autograph Collection, SF Hotel Investors ultimately elected not to partner with Marriott due to the terms required by Marriott. (Doc. No. 41 at ¶ 46.) EB5 Global reported this decision to the EB-5 Fund investors, including Plaintiffs, in a letter dated March 16, 2015, explaining to the investors how certain terms insisted on by Marriott would endanger their investments. (Id.; Doc. No. 41-1 at 34-35.) Instead, the letter indicated that the Hotel would be

branded through the Proper Hotel brand, a new brand that had been launched by Kor.  (See Doc. No. 41-1 at 34.)

### 4.    Hotel Renovation Cost Overrun

As mentioned above, the CPOM provided potential EB-5 Fund investors estimated acquisition and renovation costs for the Hotel.  (See Doc. No. 35 at 26.)  Initially, it estimated that the total cost would be "$62,971,971, of which $17,693,532 was characterized as 'land, net of pre-development expenses', and $9,976,164 was characterized as 'building and shell'" expenses. (Doc. No. 41 at ¶ 33; Doc. No. 35 at 26.)  However, in addition to a three-year renovation delay, the renovation costs increased significantly, with the "land, net of pre-development" expenses increasing to $18,112,478 and the "building and shell" expenses increasing to $47,406,521.  (See id. at ¶¶ 34, 36.)  In total, the cost for the Hotel's acquisition and renovation increased by approximately $40 million, from almost $63 million to $110,562,585.  (Id. at ¶ 35.)

### 5.    Fire at the Hotel

On August 4, 2014, while the Hotel was undergoing renovation, a fire broke out at the Hotel, causing $1 million in damage to the building and destroying $200,000 worth of the Hotel's contents.  (See id. at ¶ 53; Ex. 4.)  On August 6, 2014, two days after the fire occurred, CBS News published an article about the fire, reporting that, while the fire had spread throughout the eight-story building, the flames had been heaviest between the second and third floors.[4]  (See Ex. 4.)

---

[4]  Plaintiffs allege the CBS News article reported that the fire "only affected one or two hotel rooms[.]"  (See Doc. No. 41 at ¶ 53.)  However, upon review of the article attached to the Amended Complaint as Exhibit 4, the article instead indicates that "the fire was heaviest between the second and third floors of the eight-story building."  (See Doc. No. 41-1 at 43-48.)

### 6.    Additional Loans and Default

To finance the Hotel's renovation cost overrun, SF Hotel Investors obtained additional loans and refinanced existing ones.  (Id. at ¶ 51.)  SF Hotel Investors is now reportedly in default on these loans, putting Plaintiffs' investments at risk.  (See id. at ¶ 99 (mentioning a potential impending loss of the Hotel due to foreclosure).)

### 7.    Plaintiffs' Allegations

Based on the preceding events, Plaintiffs allege that Defendants made misrepresentations to them and to the other EB-5 Fund investors, inducing them to invest $500,000 each in the EB-5 Fund, and then proceeding to mismanage both the Hotel and Plaintiffs' investments.  (See Doc. No. 59 at 5.)  Specifically, they claim that, after securing Plaintiffs' investments, "Defendants – through a bait-and-switch, intentional inflation of expenses, and unreasonable self-dealing – absconded with Plaintiffs' money."  (Id.)  For example, Plaintiffs claim that "Defendants informed Plaintiffs that their money would be going towards a Marriott hotel, and instead, they funneled the money to their own coffers and decided to have one of their own companies brand the hotel, not Marriott."  (Id.)  In addition, they assert that Plaintiffs used the fire in 2014, which damaged only a portion of the Hotel, "to justify all of the unjustifiable amount of expenses in the renovation and losses of the Hotel."  (Doc. No. 41 at ¶ 53.)

### C.    Procedural Background

On May 8, 2024, Plaintiffs filed a Class Action Complaint against Defendants, alleging claims directly and derivatively on behalf of the EB-5 Fund and SF Hotel Investors.  (Doc. No. 1.)  On September 26, 2024, SF Hotel Investors, Kor Defendants, Brad Korzen, Kelly Wearstler, Alex Samek, and Brian De Lowe's (collectively, the "Additional Moving Defendants") filed a Motion to Dismiss the Complaint for Failure to State a Claim and EB5 Global filed a Motion to Dismiss

11

the Complaint for Lack of Subject Matter Jurisdiction.  (Doc. Nos. 28, 29.)  In response, Plaintiffs filed an Amended Complaint.  (Doc. No. 41.)  In light of the Amended Complaint, the Court denied Defendants' Motions to Dismiss the Complaint without prejudice as moot.  (Doc. No. 57.)  As mentioned above, Plaintiffs assert the following claims in the Amended Complaint:  (1) breach of contract against EB5 Global (Count I); (2) breach of fiduciary duty against EB5 Global (Count II); (3) breach of contract against EB5 Global and the Kor Defendants (Count III); (4) breach of fiduciary duty against EB5 Global and the Kor Defendants (Count IV); and (5) violations of Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act against all Defendants (Count V).  (See Doc. No. 41.)  Counts I and V are direct claims brought by Plaintiffs on behalf of a class consisting of the EB-5 Fund investors, while Counts II, III, and IV are derivative claims brought on behalf of the EB-5 Fund and SF Hotel Investors.  (Id. at ¶ 22(a).)

On February 20, 2020, the Additional Moving Defendants filed a Motion to Dismiss the Amended Complaint for Failure to State a Claim and EB5 Global filed a Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction.  (Doc. Nos. 45, 49.)  On the same day, Additional Moving Defendants also filed a Motion to Strike, requesting that the Court strike Exhibit 1 to the Amended Complaint.  (Doc. No. 47.)  On May 2, 2025, Plaintiffs filed Responses in Opposition to each of the three Motions.  (Doc. Nos. 59, 61, 63.)  On May 16, 2025, Defendants filed Replies in support of their respective Motions.  (Doc. Nos. 71, 73.)  On July 1, 2025, the Court held a hearing on the Motions.  (See Doc. No. 80.)  The Motions to Dismiss the Amended Complaint (Doc. Nos. 45, 49) and the Motion to Strike (Doc. No. 47) are now ripe for disposition.

## III.    STANDARD OF REVIEW

### A.    Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal on the grounds that the Court lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "At issue in a Rule 12(b)(1) motion is the court's very power to hear the case."  Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006) (internal quotation marks omitted).  A motion to dismiss for lack of standing is also brought under Federal Rule of Civil Procedure 12(b)(1) because standing is a jurisdictional matter.  Const. Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (internal citation omitted).

A district court considering a motion pursuant to Rule 12(b)(1) must first determine whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because that distinction determines how the pleading must be reviewed."  Id.  A facial challenge contests the sufficiency of the complaint because of a defect on its face, such as lack of diversity among the parties or the absence of a federal question.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In a facial challenge, the court must consider the allegations of the complaint as true and consider only those allegations in the complaint and the attached documents in deciding whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000); see also U.S. ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (terming a facial attack as "an alleged pleading deficiency").  Thus, a court applies the same standard of review used in considering a motion to dismiss under Rule 12(b)(6).

A factual attack, on the other hand, challenges the actual failure of the plaintiff's claims to "comport with the jurisdictional prerequisites."  Pa. Shipbuilding, 473 F.3d at 514.  Such an

evaluation may occur at any stage of the proceeding, but only after the defendant has filed an answer. Mortensen, 549 F.2d at 891-92. When a court is confronted with a factual attack, "[it] is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and the plaintiff bears the burden of showing that jurisdiction does in fact exist. Id. A district court may consider evidence outside the pleadings. Gould Elecs. Inc., 220 F.3d at 176 (internal citation omitted). No presumption of truthfulness attaches to the plaintiff's allegations, such that the existence of disputed material facts does not preclude a court from evaluating the merits of jurisdictional claims. Mortensen, 549 F.2d at 891.

**B.      Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit

must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### C.    Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)

Pursuant to Federal Rule of Civil Procedure 12(f), upon a motion by either party, the "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a Rule 12(f) motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters." United States v.

15

Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012).  A matter is immaterial if it has no essential or important relationship to the claim for relief.  Nelson v. Bender, No. 3:15-64, 2015 WL 8207490, at *4 (W.D. Pa. Dec. 7, 2015).  Although courts possess considerable discretion in disposing of a motion to strike under Rule 12(f), "striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record."  BJ Energy LLC v. PJM Interconnection, LLC, No. 08-3649, 2010 WL 1491900, at *1 (E.D. Pa. Apr. 13, 2010).

## IV.    ANALYSIS

### A.    Documents Incorporated into Amended Complaint

When reviewing a motion to dismiss filed under Rule 12(b)(6), "[a] court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference."  Senju Pharm. Co., Ltd. v. Apotex, Inc., 921 F. Supp. 2d 297, 306 (D. Del. 2013).  Here, the Court may consider on the instant Motions to Dismiss the above-referenced Limited Liability Company Agreement, Confidential Private Offering Memorandum ("CPOM"), and Limited Partnership Agreement because they are incorporated into the Amended Complaint by reference.  (See Doc. No. 41 at ¶¶ 21(b), 32, 33, 41).  The Subscription Agreement and Investor Eligibility Questionnaire are attached to the CPOM as exhibits and thus also incorporated into the Amended Complaint by reference.  (See Doc. No. 35.)  The Court may also consider the promotional materials sent to the potential EB-5 Fund investors, the letter to investors dated March 16, 2015 regarding SF Hotel Investors' decision to not soft brand the Hotel under Marriott's Autograph Collection, the letter of intent from Marriott, and the CBS News article concerning the fire at the Hotel because these are attached as exhibits to the Amended Complaint. (See Doc. No. 41-1.)

### B.    Motions to Dismiss Will Be Granted

In the Motions to Dismiss, Defendants argue that the Amended Complaint should be dismissed for the following reasons:  (1) the Court lacks subject matter jurisdiction over Counts I through IV, relying on Federal Rule of Civil Procedure 12(b)(1); (2) Plaintiffs' lack standing to bring the case, relying on Rule 12(b)(1); (3) the claims are time-barred by the applicable statutes of limitations and repose; and (4) Plaintiffs failed to state the claims alleged in Counts I through V, relying on Rule 12(b)(6).  (See Doc. Nos. 46, 50.)  The Court will address each argument in turn.  But because the Court concludes, infra, that it lacks subject matter jurisdiction over Counts I through IV, and that each of the claims are barred by the applicable statutes of limitations and repose, the Court need not address Defendants' standing and failure to state a claim arguments.

### 1.    Court Lacks Subject Matter Jurisdiction

In the Amended Complaint, Plaintiffs submit that the Court has subject matter jurisdiction on the following grounds:  (1) pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, and 1711-1715; (2) pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a); and (3) diversity of citizenship jurisdiction under 28 U.S.C. § 1332.  (Doc. No. 41 at ¶¶ 18-20.)  In its Motion to Dismiss the Amended Complaint, EB5 Global challenges Plaintiffs' assertion that the Court has subject matter jurisdiction under CAFA over the class action claim in Count I because the numerosity requirement, as explained below, is not met.  (Doc. No. 50 at 10.) In addition, it argues that the Court does not have diversity of citizenship jurisdiction over the claims in Counts I through IV because the parties' citizenships are not completely diverse.  (Id.) Defendants do not challenge the Court's subject matter jurisdiction under Section 27 of the

Exchange Act, 15 U.S.C. § 78aa(a), which grants the Court jurisdiction over Plaintiffs' Exchange Act claim in Count V.[5]

### a.    Defendant's Subject Matter Jurisdiction Arguments Are a Facial Attack on the Amended Complaint

As an initial matter, "[a] district court has to first determine . . . whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed."  Aichele, 757 F.3d at 357.  Here, Defendant's arguments that the Court lacks subject matter jurisdiction are a facial attack on the Amended Complaint.  Its argument that CAFA does not confer subject matter jurisdiction because the numerosity requirement is not met is based on a defect on the face of the Amended Complaint.  Thus, this argument against subject matter jurisdiction is a classic facial challenge to the Amended Complaint.  See Mortensen, 549 F.2d at 891 (characterizing a "12(b)(1) motion[] that attack[s] the complaint on its face" as a facial attack).

In contrast, its argument that the Court does not have diversity of citizenship jurisdiction challenges the truthfulness of Plaintiffs' jurisdictional allegations.  Said differently, Defendant is attacking the existence of subject matter jurisdiction in fact.  See id.  While it may appear that this argument is a factual challenge to the Amended Complaint, factual challenges may only occur after the answer has been served.  Id. at 892 (emphasis added).  Where a defendant files a motion to dismiss under Rule 12(b)(1) before it answers the complaint, that "motion constitutes a facial

---

[5]  Section 27 of the Exchange Act states in pertinent part as follows:

> The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

15 U.S.C. § 78aa(a).

attack on [the] complaint." <u>Moore v. Angie's List, Inc.</u>, 118 F. Supp. 3d 802, 812 (E.D. Pa. 2015). In this case, Defendant filed the instant Motion to Dismiss the Amended Complaint before it answered the Amended Complaint, meaning its diversity of citizenship argument must be construed as a facial challenge to the Amended Complaint.

Thus, because both Defendant's arguments against the existence of subject matter jurisdiction are facial challenges to the Amended Complaint, the Court will apply the same standard of review as it would on a motion brought under Rule 12(b)(6). See <u>Gould Elecs.</u>, 220 F.3d at 176.

### b.    Class Action Fairness Act Does Not Confer Subject Matter Jurisdiction

First, the Court lacks jurisdiction under the Class Action Fairness Act ("CAFA") over Count I because the numerosity requirement is not met.  Under CAFA, a district court has original jurisdiction over class actions where "the matter in controversy exceeds the sum or value of $5,000,000[.]"  28 U.S.C. § 1332(d)(2); <u>see also</u> <u>Standard Fire Ins. Co. v. Knowles</u>, 568 U.S. 588, 590 (2013).  But in order for a district court to have jurisdiction under CAFA, the number of proposed class members cannot be less than 100 members (the "numerosity requirement"). [6] <u>See</u>

---

[6]   In their Response in Opposition to EB5 Global's Motion to Dismiss the Amended Complaint, Plaintiffs argue that CAFA confers subject matter jurisdiction because, "[w]here plaintiffs seek injunctive relief, rigorous application of the numerosity requirement is not warranted."  (Doc. No. 61 at 11 (quoting <u>In re Generic Pharms. Pricing Antitrust Litig.</u>, No. 16-md-2724, 2025 WL 754546, at *7 (E.D. Pa. Mar. 7, 2025)).)  However, the principle cited by Plaintiffs refers to Federal Rule of Civil Procedure 23's numerosity requirement rather than the numerosity requirement found in the Class Action Fairness Act ("CAFA").  <u>See</u> <u>In re Generic Pharms. Pricing Antitrust Litig.</u>, 2025 WL 754546, at *7 (discussing a court's treatment of Rule 23's numerosity requirement); <u>compare</u> Fed. R. Civ. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members only if:  (1) <u>the class is so numerous that joinder of all members is impracticable</u> . . . ."), <u>with</u> 28 U.S.C. § 1332(d)(5)(B) (specifying that CAFA's conferral of federal jurisdiction over class actions does not apply "to any class action in which . . . the number of members of all proposed plaintiff classes in the aggregate is less than 100").  Because the numerosity requirement found in CAFA is the one at

28 U.S.C. § 1332(d)(5)(B) ("Paragraphs (2) through (4) [of 28 U.S.C. § 1332(d)] shall not apply to any class action in which . . . the number of members of all proposed plaintiff classes in the aggregate is less than 100.")  Moreover, CAFA defines "class members" as "the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action."  28 U.S.C. § 1332(d)(1)(D).

Here, because the proposed class contains less than 100 members, CAFA does not confer subject matter jurisdiction over the class action claim in Count I.  In the Amended Complaint, Plaintiffs describe the class as totaling "approximately 90 individuals," but specifies that they believe the class to be "no less than 84 individuals[.]" (Doc. No. 41 at ¶¶ 22(a), 56.)  Thus, because Plaintiffs only allege there to be, at most, 90 members of the instant class, CAFA's numerosity requirement is not met.

Recognizing this impediment to their claim in Count I and in an attempt to satisfy CAFA's numerosity requirement, Plaintiffs argue that because they invested in the EB-5 Fund using money pooled together by their families, the "total number of defrauded victims" exceeds the 100-person requirement.  (Doc. No. 61 at 13.)  To support this contention, Plaintiffs Nan Liu, Hao Liu, and Guangxiang Xu each submitted declarations that their limited partnership investments were "comprised of a number of individual investors." (See Doc. Nos. 60, 60-1, 60-2.)  Specifically, Plaintiff Guangxiang Xu asserts that his limited partnership interest is made up of himself and Li Xiao.  (Doc. No. 60.)  Similarly, Plaintiff Hao Liu claims his limited partnership interest consists of himself and Guisong Liu.  (Doc. No. 60-1.)  And Plaintiff Nan Liu declares that her limited partnership interest includes herself and Liu Shuzhong.  (Doc. No. 60-2.)  In total, through these

issue in the instant Motions, Plaintiff's argument concerning Rule 23's numerosity requirement is misplaced.

declarations, Plaintiffs claim an additional three class members. But three additional class members is still not enough to meet CAFA's 100-class member numerosity requirement. And the possibility that the unnamed class members also purchased limited partnership interests in the EB-5 Fund using money pooled together by their families is too speculative to confer subject matter jurisdiction in this Court under CAFA.

In addition, there is another reason why the 100-person threshold is not met: Plaintiffs' family members do not qualify as members of the class under the class definition provided in the Amended Complaint. See Brown v. Santander Consumer USA Inc., No. 3:24-CV-00665, 2025 WL 455373, at *3 (S.D. Ill. Feb. 11, 2025) (identifying the relevant question for courts determining whether CAFA's numerosity requirement has been met as "whether 100 or more people fall within the class definition in [Plaintiffs'] complaint"). In the Amended Complaint, Plaintiffs define the proposed class as "all others who were solicited and/or invested in the Hotel for the purpose of obtaining an EB-5 visa." (Doc. No. 41 at ¶ 55.) In other words, the members of the proposed class "are [the] limited partners of the EB-5 Fund." (Id. at ¶ 59.) In addition, the Amended Complaint describes the proposed class as "easy to identify from the records of their investment." (Id. at ¶ 56.)

As made clear by Plaintiffs' investment records, Plaintiffs family members are not included among the limited partners of the EB-5 Fund. For example, the Limited Partnership Agreement executed by Plaintiff Guangxiang Xu names only Xu as the limited partner. (See Doc. No. 35 at 117.) In addition, Xu's Subscription Agreement defines "the undersigned" as "the investor," and is signed only by Xu. (See id. at 125, 133.) Finally, each prospective investor in the EB-5 Fund was required to complete an Investor Eligibility Questionnaire before being approved as investors, and only Xu completed the questionnaire. (See id. at 135-38.) Thus, while

Plaintiff Guangxiang Xu claims in his declaration that his limited partnership interest is made up of himself and Li Xiao, the investment records identify only Xu as the limited partner. And the same investment records for Plaintiffs Hao Liu and Nan Liu similarly only identify them, rather than their family members, as the limited partners. (See Doc. Nos. 35-1, 35-2.) Accordingly, because the numerosity requirement is not met and Plaintiffs' family members do not qualify as class members, the Court does not have subject matter jurisdiction under CAFA over Count I.

### c.    Court Lacks Diversity of Citizenship Jurisdiction

Next, the Court also lacks diversity of citizenship jurisdiction over Counts I through IV because the parties are not completely diverse. Under 28 U.S.C. § 1332, diversity of citizenship jurisdiction exists where:

> the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> (1) citizens of different States;
>
> (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;
>
> (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
>
> (4) a foreign state . . . as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a)(2). For a federal court to exercise original jurisdiction, there must be complete diversity of citizenship between the parties, meaning "no plaintiff [may] be a citizen of the same state as any defendant." Lincoln Ben. Life Co. v. AEI Life, LLC, 800 F.3d 99, 104 (3d Cir. 2015) (quoting Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 419 (3d Cir. 2010)). Importantly, it is the burden of the party asserting diversity jurisdiction to prove that diversity of citizenship

exists by a preponderance of the evidence.  See Washington v. Hovensa LLC, 652 F.3d 340, 345 (3d Cir. 2011).

To determine an individual's citizenship for purposes of diversity jurisdiction, "citizenship is synonymous with domicile, and 'the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'"  Park v. Tsiavos, 165 F. Supp. 3d 191, 199 (D.N.J. 2016).  As such, "[c]itizenship and residence . . . are not synonymous terms."  MidCap Media Finance, L.L.C. v. Pathway Data, Inc., 929 F.3d 310, 313 (5th Cir. 2019) (quoting Robertson v. Cease, 97 U.S. 646, 648 (1878)).

Conversely, the citizenship of a limited liability company ("LLC") "is determined by the citizenship of its members."  Zambelli, 592 F.3d at 418; see also Lincoln Ben. Life Co., 800 F.3d at 105 ("The state of organization and the principal place of business of an unincorporated association are legally irrelevant.")  Additionally, "where an LLC has, as one of its members, another LLC, 'the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be' to determine the citizenship of the LLC."  Zambelli, 592 F.3d at 420 (citation omitted).  Similarly, the citizenship of a limited partnership is "based on the citizenship of all its partners; that is, the citizenship of each general and limited partner."  GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 37 (3d Cir. 2018).

Here, because Plaintiffs have not carried their burden of proving by a preponderance of the evidence that the parties are completely diverse, the Court does not have diversity of citizenship jurisdiction over Counts I through IV.[7]  In the Amended Complaint, Plaintiffs allege the following regarding the citizenship of the parties:

---

[7]  Plaintiffs argue that, because it asserts that the Court has subject matter jurisdiction over Count I under the Class Action Fairness Act ("CAFA"), they need only prove the existence of minimal diversity to establish diversity of citizenship jurisdiction over this claim.  (Doc. No. 61 at 13

2. Plaintiff Nan Liu is an individual and resident of China.

3. Plaintiff Hao Liu is an individual and resident of China.

4. Plaintiff Guangxiang Xu is an individual and resident of China.

5. Derivative Plaintiff EB-5 SF Investment Limited Partnership is a Delaware limited partnership.

6. Derivative Plaintiff SF Hotel Investors LLC is a Delaware limited liability company.

7. Defendant EB5 Global SF, LLC is an Oregon limited liability company.

8. Defendant MiMA Real Estate Partners I, LLC is a Delaware limited liability Company.

9. Defendant Renoir HM, LLC is a Delaware limited liability company.

10. Defendant Proper Hospitality LLC is a Delaware limited liability company.

11. Defendant Kor Realty Group LLC is a California limited liability company.

12. Defendant Brad Korzen is an individual resident of the State of California and principal of Kor Realty Group LLC.

13. Defendant Kelly Wearstler is an individual resident of the State of California and the wife of Brad Korzen.

14. Defendant Alex Samek is an individual resident of the State of California and principal of Kor Realty Group LLC.

15. Defendant Brian DeLowe is an individual resident of the State of California and principal of Kor Realty Group LLC.

(Doc. No. 41 at ¶¶ 2-15.)

---

(citing 28 U.S.C. § 1332(d)(2)(A).)  But while it is true that CAFA only requires in that situation the parties to be minimally diverse, the Court has already held that because CAFA's numerosity requirement is not met, the Court does not have subject matter jurisdiction under CAFA.  As such, Plaintiffs must establish that the parties are completely diverse, rather than minimally diverse, in order for the Court to exercise diversity of citizenship jurisdiction.

Notably, the allegations in paragraphs 2, 3, 4, 12, 13, 14, and 15 regarding the individual Plaintiffs and Defendants refer only to where these parties reside rather than where they are domiciled. But as noted, the crucial inquiry when assessing the citizenship of an individual is their domicile rather than their residence. Without allegations concerning the individual parties' domiciles, Plaintiffs fail to properly allege diversity of citizenship jurisdiction. See Doe v. Hosbach, No. 24-4756, 2024 WL 5146855, at *3 (D.N.J. Dec. 17, 2024) (finding that because the plaintiff only alleged her state of residence, rather than her state of domicile, her allegations were insufficient to plead diversity of citizenship jurisdiction); see also MidCap Media Finance, 929 F.3d at 313 (explaining that, because "[c]itizenship and residence . . . are not synonymous terms" and a diversity of citizenship analysis focuses on a party's domicile rather than their residence, "an allegation of residency alone does not satisfy the requirement of an allegation of citizenship") (citations and internal quotations omitted).

Moreover, the allegations in paragraphs 5 through 11, as quoted above, regarding the limited partnership Defendant and the limited liability company Defendants recite only the state with which these Defendants are associated. (See, e.g., Doc. No. 41 at ¶¶ 5, 6, 9 ("Derivative Plaintiff EB-5 SF Investment Limited Partnership is a Delaware limited partnership . . . Derivative Plaintiff SF Hotel Investors LLC is a Delaware limited liability company . . . Defendant Renoir HM, LLC is a Delaware limited liability company.")) However, as mentioned above, the citizenship of limited liability companies and limited partnerships depends on the citizenship their members and partners. Without allegations identifying the members and partners of each of the limited partnership and limited liability company Defendants, Plaintiffs again fail to properly allege diversity of citizenship jurisdiction. See id. at 314 (holding that because the pleadings only identified the limited liability company plaintiff's state of organization and principal place of

business rather than the citizenship of its members, the allegations were insufficient to establish diversity of citizenship jurisdiction); see also Kaga v. Elsoury, No. 19-14814, 2020 WL 1479522, at *3 (D.N.J. Feb. 25, 2020) ("[T]he Notice of Removal failed to provide the citizenship of any of the members of the various defendant limited-liability companies and limited partnerships. Therefore, the Court concludes that the Notice of Removal has failed to demonstrate that there is complete diversity between Plaintiff and all Defendants.")

Thus, because the Amended Complaint contains no allegations regarding the individual parties' domiciles nor the citizenships of the limited partnership and limited liability company Defendants' respective partners and members, Plaintiffs have not met their burden of proving that diversity of citizenship jurisdiction exists by a preponderance of the evidence. Accordingly, since the Court does not have subject matter jurisdiction over Count I under the Class Action Fairness Act or over Counts I through IV under diversity of citizenship jurisdiction, the case will be dismissed as to the claims asserted in Counts I through IV.[8]  But because Defendants do not challenge the Court's subject matter jurisdiction over the claim in Count V that Defendants violated Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act, Count V will not be dismissed for a lack of subject matter jurisdiction.

---

[8]  In addition to EB5 Global's arguments as to why the Court lacks subject matter jurisdiction in this case, Additional Moving Defendants argue in their Motion to Dismiss the Amended Complaint that the Court does not have subject matter jurisdiction because the allegations against it center on alleged breaches of a contract that require the parties to go to mediation and/or arbitration before bringing a court action.  (Doc. No. 46 at 25.)  But because the Court concludes, supra, that it lacks subject matter jurisdiction under CAFA and 28 U.S.C. § 1332, it need not also address Additional Moving Defendants' argument against subject matter jurisdiction.

### 2.    Plaintiffs' Claims Are Time Barred by the Statutes of Limitations and Repose

In addition to the Court lacking subject matter jurisdiction over Counts I through IV, each of the claims asserted by Plaintiffs are barred by the applicable statutes of limitations and repose. As mentioned above, the Amended Complaint alleges the following claims:  (1) breach of contract against EB5 Global (Count I); (2) breach of fiduciary duty against EB5 Global (Count II); (3) breach of contract against EB5 Global and the Kor Defendants (Count III); (4) breach of fiduciary duty against EB5 Global and the Kor Defendants (Count IV); and (5) violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act against all Defendants (Count V).  (See generally Doc. No. 41.)

### a.    Counts I Through IV Are Time Barred by the Statute of Limitations

First, because the breach of contract claims and breach of fiduciary duty claims asserted in Counts I through IV accrued more than three years ago, they are barred by the statute of limitations. In Delaware, both breach of contract claims and breach of fiduciary duty claims are subject to a three-year statute of limitations.  DEL. CODE ANN. tit. 10, § 8106.  The statute of limitations "begins to run at the time . . . the cause of action accrues, which is generally when there has been a harmful act by a defendant."  In re Tyson Foods, Inc., 919 A.2d 563, 584 (Del Ch. 2007).  "This is true even if the plaintiff is unaware of the cause of action or the harm."  Id.  In other words, a plaintiff need only be on "inquiry notice" for the statute of limitations to begin to run, meaning the "plaintiff has notice of facts from which the basis for the cause of action 'could have been discovered by the exercise of reasonable diligence.'"  Ocimum Biolsolutions (India) Ltd. v. AstraZeneca UK Ltd., No. N15C-08-168, 2019 WL 6726836, at *9 (Del. Super. Ct. Dec. 4, 2019).  The statute of limitations can be tolled, however, "where there is fraudulent concealment, inherently unknowable

injury, or equitable tolling." <u>TL of Fla., Inc. v. Terex Corp.</u>, 54 F. Supp. 3d 320, 328 (D. Del. 2014).

The statute of limitations will be tolled by fraudulent concealment where "a defendant has fraudulently concealed from a plaintiff the facts necessary to put [the plaintiff] on notice of the truth." <u>LGM Holdings, LLC v. Schurder</u>, No. 314, 2024, 2025 WL 1162999, at *8 (Del. Apr. 22, 2025). "Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." <u>Id.</u> In addition, the statute of limitations will be equitably tolled where "a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." <u>Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton</u>, 294 A.3d 65, 94 (Del. Ch. 2023). Fraudulent concealment and equitable tolling do not, however, "toll a statute of limitations . . . 'beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.'" <u>Id.</u> at *9 (citation omitted). Put differently, even in a case of fraudulent concealment or tolling, "the limitations period begins to run when the plaintiff is . . . on inquiry notice." <u>Weiss v. Swanson</u>, 948 A.2d 433, 451 (Del. Ch. 2008).

In contrast, for the statute of limitations to be tolled by an inherently unknowable injury, the injury must be "inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of." <u>Wal-Mart Stores, Inc. v. AIG Life Ins. Co.</u>, 860 A.2d 312, 319 (Del. 2004). For an injury to be "inherently unknowable," discovery of the injury must be practically impossible—that is, "there must have been no observable or objective factors to put a party on notice of an injury." <u>Lebanon Cnty. Ret. Fund v. Collis</u>, 287 A.3d 1160, 1215 n.25 (Del. Ch. 2022). "In such a case, the statute will begin to run only 'upon the discovery of facts 'constituting the basis of the cause of action or the existence of facts sufficient to put a person of

ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of such facts.'" Wal-Mart Stores, 860 A.2d at 319 (citation omitted).

Here, Plaintiffs' breach of contract claims (Counts I and III) and breach of fiduciary duty claims (Counts II and IV) are barred by the statute of limitations because they are untimely and the tolling doctrines of fraudulent concealment, inherently unknowable injury, and equitable tolling do not apply. As alleged in the Amended Complaint, the breach of contract and breach of fiduciary duty claims stem from EB5 Global and the Kor Defendants' conduct occurring from 2012 through 2015. (See generally Doc. No. 41.) The most recent allegation giving rise to these claims is the March 16, 2015 letter sent by EB5 Global to Plaintiffs communicating that the Hotel would not be entering into a franchise agreement with Marriott. (Id. at ¶ 46.) Thus, at the latest, the three-year statute of limitations on these claims expired on March 16, 2018. And, as mentioned above, Plaintiffs filed their Complaint on May 8, 2024. (See Doc. No. 1.)

Plaintiffs argue, however, that the statute of limitations on these claims were tolled by fraudulent concealment and equitable tolling due to the conduct of immigration agencies in China acting as Defendants' agent. Specifically, they allege that "as recently as 2023, [Defendants] used immigrant [sic] agencies in China to continue to make [] Plaintiffs believe that their investment would be fully repaid." (Doc. No. 61 at 15-16 (citing Doc. No. 41 at ¶ 54); Doc. No. Doc. No. 59 at 13-15 (citing same).) But while the Court must accept these allegations as true, they do not serve to toll the statute of limitations through fraudulent concealment or equitable tolling because Plaintiffs were on inquiry notice of the facts giving rise to the claims in 2015 when EB5 Global sent them the letter stating that the Hotel would not be partnering with Marriott. (See Doc. No. 41 at ¶ 46.)

Plaintiffs also contend that the statute of limitations is tolled through the doctrine of inherently unknowable injury because they are in China and thus "had no way of discovering that Defendants stole their funds since they had to communicate through the Defendants' Chinese agents." (Doc. No. 61 at 16.) But, as described above, tolling through inherently unknowable injury requires that the injury be practically impossible to discover—that is, "there must have been no observable or objective factors to put a party on notice of an injury." Lebanon Cnty. Ret. Fund, 287 A.3d at 1215 n.25. And here, as discussed above, the injuries complained of were discoverable, at the latest, in 2015 through the letter sent by EB5 Global to Plaintiffs. (See Doc. No. 41 at ¶ 46.)

Moreover, the fact that the letter was in English while Plaintiffs are from China and potentially do not speak English does not make the injury inherently unknowable. Far from the contents of the letter being practically impossible to discover, Plaintiffs could have discovered the alleged injury, i.e., that the Hotel would no longer be partnering with Marriott, simply by having the letter translated. See Pabon v. Mahanoy, 654 F.3d 385, 401 (3d Cir. 2011) (holding in a habeas corpus case that an "inability to read or understand English" would not equitably toll the statute of limitations unless it was "combined with denial of access to translation or legal assistance); see also Taylor v. Carroll, No. 03-007, 2004 WL 1151552, at *5 (D. Del. May 14, 2004) ("To the extent petitioner asserts his alien status to demonstrate a lack of proficiency in English, this alleged language barrier does not equitably toll the statute of limitations because he has not demonstrated that any language barrier prevented him from accessing the courts.") Accordingly, because Plaintiffs' breach of contract claims (Counts I and III) and breach of fiduciary duty claims (Counts

II and IV) are untimely and the statute of limitations is not tolled by the doctrines of fraudulent concealment, equitable tolling, or inherently unknowable injury, these claims are time barred.[9]

### b.    Count V Is Time Barred by the Statute of Repose

Second, Plaintiffs' claim alleging violations of Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act (Count V) is also time barred.  Section 10(b), codified as 15 U.S.C. § 78j, and Rule 10b-5(b), codified as 17 C.F.R. § 240.10b–5, prohibit "the misrepresentation or omission of material facts in connection with the purchase or sale of any securities."  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 942 (3d Cir. 1985).  To be timely, these claims must "be brought not later than the earlier of . . . (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.  28 U.S.C. § 1658(b) (emphasis added).  The two-year limitations period provided for in 28 U.S.C. § 1658(b)(1) is a statute of limitations, while the five-year limitations period provided for in § 1658(b)(2) is a statute of repose.  See In re Exxon Mobil Corp. Secs. Litig., 500 F.3d 189, 199 (3d Cir. 2007).

The statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first."  Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(2)).

---

[9]    During the July 1, 2025 hearing on the Motions, Plaintiffs' counsel asserted an additional argument regarding the timeliness of the breach of contract and breach of fiduciary duty claims: because the alleged injuries stemming from Defendants' purported breach of contract and breach of fiduciary duties are ongoing, these claims are thus timely.  But as mentioned above, the statute of limitations on breach of contract and breach of fiduciary duty claims "begins to run at the time . . . the cause of action accrues, which is generally when there has been a harmful act by a defendant."  In re Tyson Foods, Inc., 919 A.2d at 584.  And here, these causes of action accrued, at the latest, in 2015 when EB5 Global sent Plaintiffs the letter reporting that the Hotel would not be partnering with Marriott.  (See Doc. No. 41 at ¶ 46.)  Merely alleging that acts are ongoing without specifying what those acts are does not toll the statute of limitations.  And even if Plaintiffs are claiming that EB5 Global, MiMa, and other Defendants are still draining money from Hotel proceeds, Defendants are permitted to do so by the documents incorporated into the Amended Complaint.  Moreover, Plaintiffs were on notice of these payments since at least 2015 and before.

In contrast, the statute of repose "begins to run on the date of the last alleged misrepresentation" and acts as "an unqualified bar on actions instituted '5 years after such violation,' . . . giving defendants total repose after five years." McCullough v. Advest, Inc., No. 17-407, 2017 WL 3675787, at *3 (W.D. Pa. Aug. 25, 2017); Merck, 559 U.S. at 650 (quoting 28 U.S.C. § 1658(b)(2)). In other words, the five-year limit imposed by the statute of repose "is measured . . . from the date of the last culpable act or omission of the defendant." CTS Corp. v. Waldburger, 573 U.S. 1, 8 (2014).

Here, because the alleged misrepresentations by Defendant in connection with Plaintiffs' investments in the EB-5 Fund occurred well over five years ago, the Securities Act claim is barred by the statute of repose. Plaintiffs allege that Defendants made the following misrepresentations in violation of the Exchange Act when sourcing investors for the EB-5 Fund: (1) stating that the Hotel would be managed by Marriot, and (2) representing through a letter from the San Francisco mayor that the Hotel was an "approved project" of the City of San Francisco, thus "implying that the City had guaranteed the return of [Plaintiffs'] investments" (Doc. No. 41 at ¶ 44.) But even accepting as true Plaintiffs' contention that Defendants made such representations and, moreover, that the representations were false, these misrepresentations would have been made at some point prior to Plaintiffs' investing in the EB-5 Fund in December 2012. Therefore, the five-year statute of repose required any claims under the Exchange Act stemming from these alleged misrepresentations to be brought no later than December 2017. Accordingly, because Plaintiffs did not assert the Exchange Act claim in Count V until May 8, 2024, the date the original Complaint was filed, the claim is time barred by the statute of repose.[10]

---

[10] During the July 1, 2025 hearing on the Motions, Plaintiffs' counsel also argued that because EB5 Global continues to represent to Plaintiffs and the other EB-5 Fund investors that their investments are still worth $500,000, despite the Hotel being in default on its loans, the

###### C.      Motion to Strike Will Be Denied as Moot

Finally, Defendants SF Hotel Investors, Kor Defendants, Brad Korzen, Kelly Wearstler, Alex Samek, and Brian De Lowe's ("Additional Moving Defendants") Motion to Strike (Doc. No. 47) will be denied as moot.  In the Motion, Additional Moving Defendants request that the Court strike Exhibit 1 of the Amended Complaint, which is a copy of the promotional materials sent to potential investors in the EB-5 Fund, because more than half of the exhibit is not in English and Plaintiffs have not included a certified translation.  (See Doc. No. 47 at 2.)  But in accordance with the statement of the Court at the July 1, 2025 hearing in which it ruled that the Motion to Strike would be denied because Plaintiffs had included sufficient translations of Exhibit 1, and in light of the Court's above decision to grant Defendants' Motions to Dismiss the Amended Complaint, thus dismissing the case in its entirety, the Motion to Strike (Doc. No. 47) will be denied as moot.

### V.      CONCLUSION

For the foregoing reasons, the Motions to Dismiss the Amended Complaint (Doc. Nos. 45, 49) will be granted and the Motion to Strike (Doc. No. 47) will be denied as moot.  An appropriate Order follows.

---

misrepresentations giving rise to the claim in Count V are ongoing and thus not barred by the statute of repose.  But, as mentioned, claims under Section 10(b) and Rule 10b-5(b) of the Securities Exchange Act relate to misrepresentations "in connection with the purchase or sale of any securities."  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 942 (3d Cir. 1985) (emphasis added).  And any representation, false or not, regarding the current value of Plaintiffs' investments does not relate to the purchase or sale of securities given that Plaintiffs already purchased the securities at issue and are now merely receiving updates on their performance.